# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ANGELICA OCASIO,

                                        Plaintiff,

                    -v.-                                    3:14-CV-1096
                                                            (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

PETER A. GORTON, ESQ., Attorney for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, Senior United States District Court Judge pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

On April 2, 2012, plaintiff protectively filed an application for Disability

Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging

disability beginning August 1, 2008 due to schizophrenia, anxiety, high blood pressure,

and heart palpitations. (Administrative Transcript ("T.") 112-19). The applications

were denied initially on June 5, 2012. (T. 56-63). Plaintiff requested a hearing before

an Administrative Law Judge ("ALJ"), which was held on November 6, 2012. (T. 38-

54). On, January 30, 2013, ALJ Marie Greener found plaintiff was not disabled. (T. 21-

37). The ALJ's decision became the Commissioner's final decision when the Appeals

Council denied plaintiff's request for review with a written explanation, dated June 30, 2014. (T. 1-9).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the

2

[Commissioner ] will consider him disabled without considering
vocational factors such as age, education, and work experience . . . .
Assuming the claimant does not have a listed impairment, the fourth
inquiry is whether, despite the claimant's severe impairment, he has the
residual functional capacity to perform his past work. Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. **FACTS**

Plaintiff's brief contains a summary of the medical evidence. (Pl.'s Br. at 2-7). Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any exceptions as noted.

## IV. **ALJ'S DECISION**

The ALJ found that plaintiff met the insured status requirements for DIB through December 30, 2009, and that plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 1, 2008. (T. 27). At step two of the disability analysis, the ALJ found plaintiff had two severe impairments – anxiety and depression.

(*Id.*)  Although plaintiff also alleged disability due to schizophrenia, the ALJ determined that the impairment was not "medically determinable" because there were no "diagnostic tests or clinical findings to confirm this diagnosis," nor was there any evidence to support "any functional restrictions that have been imposed based on this condition." (*Id.*)  The ALJ also found that plaintiff's alleged physical conditions, "including high blood pressure and tooth pain," were not accompanied by any physical restrictions and were not severe. (*Id.*)

At step three of the disability analysis, the ALJ found that plaintiff did not have a listed impairment. (T. 28-29).  The ALJ considered Listing 12.04 – Affective Disorders and 12.06 – Anxiety Related Disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.  The ALJ then determined that plaintiff had the RFC to perform work "consisting of simple, routine tasks that do not significantly change in pace or location on a daily basis.  She should avoid heights, ladders, and dangerous machinery." (T. 29).  In making this determination, the ALJ gave "considerable" weight to the opinion of Dr. Alan Dubro, Ph.D., a consultative psychologist who examined plaintiff on May 24, 2012. (T. 30-31, 212-16).  The ALJ gave "significant" weight to a June 5, 2012 report by R. Altmansberger. (T. 31, 260-63).  Dr. Altmansberger did not examine plaintiff.

The ALJ placed "limited" weight on the opinion of Dr. Nathan Hare, Ph.D.,[1] in part, because the ALJ interpreted Dr. Hare's report as stating that plaintiff's psychological testing showed evidence of "possible malingering, which somewhat invalidates the results." (T. 31).  The ALJ gave "no" weight to the opinion of the

_____

[1] Dr. Hare is also a consultative psychologist who examined plaintiff. (T. 411-22).

plaintiff's treating social worker, Jill Van Pelt, LSCW-R, whose "opinion [was] not at all consistent with or supported by the entirety of the evidence, "particularly in light of possible malingering on the part of the claimant." (*Id.*)  Finally, the ALJ gave "little" weight to the statement of plaintiff's "friend" Maria Zevallos because "it [was] not a medical source opinion," and due to the "close relationship" between the women, there was a "potential for bias," which undermined the "veracity" of her statements. (*Id.*)

At step four, the ALJ found that plaintiff was unable to perform her past relevant work.  At step five, the ALJ determined that plaintiff was 31 years old, "a younger individual," on the alleged disability onset date.  She had at least a high school diploma, and was able to communicate in English. (T. 31).  After finding that the transferability of skills was not "material" to her decision, the ALJ found that "considering the claimant's age education, work experience, and residual functional capacity," there were jobs existing in significant numbers in the national economy that plaintiff could perform.

The ALJ determined that plaintiff's mental impairments "had little or no effect on the occupational base of unskilled work at all exertional levels," and that the Medical-Vocational Guidelines, "directed" a finding of not disabled under 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 204.00, notwithstanding any additional limitations regarding the plaintiff's inability to work at heights, with ladders, or around dangerous machinery. (T. 32).  Therefore, she was not disabled within the meaning of the Social Security Act. (T. 32-33).

The plaintiff appealed the ALJ's decision and submitted an additional letter from

6

Dr. Hare, together with her argument to the Appeals Council. (T. 423-25). The Appeals Council considered Dr. Hare's March 4, 2013 letter, which specifically addressed the ALJ's interpretation of Dr. Hare's original report, dated October 29, 2012. (T. 1-9). However, the Appeals Council denied plaintiff's request for review, finding that the Dr. Hare's additional information did not "provide a basis for changing the [ALJ's] decision." (T. 2).

## V.  ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1. The ALJ's RFC determination was so tainted by her misinterpretation of Dr. Hare's report that the entire decision must be reversed. (Pl.'s Br. at 8-21) (Dkt. No. 22).

2. The ALJ failed to assess plaintiff's inability to maintain acceptable attendance. (Pl.'s Br. at 21-23).

3. The ALJ's step five determination is not supported by substantial evidence. (Pl.'s Br. at 23-24).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Dkt. No. 24). For the following reasons, this court agrees with plaintiff and will recommend reversing the Commissioner's determination and remanding this action for further proceedings.

## VI.  RFC/WEIGHT OF THE EVIDENCE

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Weight of the Evidence

In making her determination, the ALJ weighs all the evidence of record and

carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that she applies and the weight that she accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B. Application

In making her RFC determination, the ALJ gave "limited weight" to Dr. Nathan Hare's October 29, 2012 report. (T. 31). It appears from the heading of his report, that Dr. Hare examined plaintiff at the request of the Broome County Department of Social Services ("DSS"). (T. 412). After reviewing plaintiff's past medical records and performing various psychological tests, Dr. Hare concluded that the plaintiff was "not able to do sustained work-related physical or mental activities in a work like setting on a regular and continuing basis." (T. 412-18, 417). Dr. Hare also completed a mental RFC evaluation, indicating that plaintiff had either "marked" restrictions in many areas

or "no useful ability to function" in several areas. (T. 419-20).  Dr. Hare stated that plaintiff's work impairment was due to several diagnoses.  Under Axis I,[2] Dr. Hare found Mood Disorder, NOS; Episodic Anger problem; R/O[3] Schizoaffective Disorder, R/O Schizophrenia-paranoid type.  Under Axis II, Dr. Hare found Personality Disorder with paranoid and schizodial features.  Under Axis III, Dr. Hare listed possible thyroid dysfunction, possible fibromyalgia.  Under Axis IV, Dr. Hare found a Vocational Disability, Lack of Social Support Group, Psychosocial Stressors, and under Axis V, Dr. Hare found that plaintiff's Current Global Assessment of Functioning score was 45, her highest GAF in past year was 40, and her "Scale of Social and Occupational Function" score was 40. (T. 417).

In determining that this report was entitled to "limited weight," ALJ Greener stated that Dr. Hare's "examination showed evidence of possible malingering, which somewhat invalidates the results." (T. 31).  The ALJ also discounted Dr. Hare's report

---

[2] Until recently, the diagnosis of mental disorders was often based on a "Multiaxial Assessment." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27-36 (4th Ed. Text Revision 2000) ("DSM-IV-TR").  Each Axis refers to a different domain of information that assisted the clinician in diagnosing, planning treatment, and predicting outcomes for the patient. *Id.*  Clinical disorders and other conditions that may be the focus of clinical attention are listed under Axis I.  Personality disorders and mental retardation are listed under Axis II. General medical conditions are listed under Axis III.  Psychosocial and environmental problems are listed under Axis IV, and the Global Assessment of Functioning ("GAF") score is listed under Axis V. *Id.*  The DSM has now been updated, and the new volume    DSM-5    no longer utilizes the multiaxial assessment system. www.psyweb.com/content/main-pages-5-fifth-edition-of-the-diagnostic-and-statistical-manual-of-mental-disorders.  The GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-4-TR at 32-34.

[3] R/O stands for "rule out."  In medicine, to "rule out" is to eliminate or exclude one diagnostic possibility from the list of causes of the patient's signs and symptoms. *Medical Dictionary* (Farlex & Partners 2009). Retrieved April 22 2016 from http://medical-dictionary.thefreedictionary.com/rule+out

because he indicated that plaintiff "has had limitations throughout her entire life, which is inconsistent with her history of performing substantial gainful activity and caring for her children." (*Id.*)

The ALJ gave "considerable weight" to a May 24, 2012 consultative report by Dr. Alan Dubro, Ph.D., and she gave "significant weight" to the report of a non-examining "State agency medical consultant, R. Altmansberger, "Psychiatry." (T. 30-31). It is unclear whether Dr. Dubro reviewed any of plaintiff's previous or current medical records.[4] However, he did conduct a mental status examination of the plaintiff and determined that her attention and concentration were "impaired secondary to distractibility associated with anxiety."[5] (T. 213-14). Plaintiff's recent and remote memory skills were "mildly" impaired secondary to the "distractibility associated with anxiety which was noted when the claimant was asked to perform [certain] tasks." (T. 214).

Dr. Dubro concluded that plaintiff could follow, understand, attend to, and remember directions and instructions. Her attention and concentration were mildly impaired, and she would experience mild difficulty in learning new tasks. (T. 214). Although she performed "daily" tasks independently on a regular basis, she did display mild difficulty in her ability to perform complex tasks and had "moderate" difficulty in her ability to interact with others. (T. 214). Dr. Dubro only assessed plaintiff with a

---

[4] Dr. Dubro's report has a section entitled "Psychiatric History," but it appears that he did not actually see the records of the treatments to which he refers. (T. 212).

[5] There is no degree of "impairment" listed in this section. However, in his "Medical Source Statement," Dr. Dubro states that attention and concentration are only "mildly" impaired. (T. 213-14).

"mild" difficulty in her ability to "regularly attend to a routine and maintain a schedule." (T. 215). He concluded that the results of his examination were "consistent with psychiatric problems, though they [did] not significantly interfere with the claimant's ability to function on a daily basis." (*Id.*) Dr. Dubro's diagnoses were: Axis I: Depressive disorder, NOS; Anxiety disorder, NOS; Axis II: None; Axis III: Hypertension. (*Id.*)

On June 5, 2012, Dr. Altmansberger performed a non-examining review of plaintiff's condition. (T. 262). He reviewed a March 29, 2012 record from Binghamton General Hospital showing a "current diagnosis" of "anxiety reaction," together with a Broome County Mental Health report of March 23, 2012, giving a diagnosis of mood disorder, NOS; R/O Schizophrenia, schizoaffective disorder. (*Id.*) Dr. Altmansberger also reviewed Dr. Dubro's report. Dr. Almansberger stated that plaintiff had no psychiatric "admissions," the "earliest documented onset of current episode" was March 23, 2012, there was "no documented longitudinal history of psychotic symptoms, nor disorder except [the] recent eval[uation] at Broome [County], and no "reported nor observed psychotic [symptoms]" at the consultative psychiatric examination. (T. 262). Dr. Altmansberger then stated that "[i]mprovement can be expected such that [plaintiff] by 03 23 13 would have no more than moderate limitations. Severe not expected to last 12 months." (*Id.*)

Dr. Altmansberger also completed an RFC evaluation, noting that plaintiff was not significantly limited in many areas, but would be "moderately limited" in her ability to maintain attention and concentration for extended periods; perform activities within

12

a schedule, maintain regular attendance, and be punctual within customary tolerances; and work in coordination with, or in proximity to, others without being distracted by them. (T. 260).  She would also be moderately limited in several of the categories of social interaction, such as the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism, and the ability to get along with co-workers or peers without distracting them. (T. 261).  Plaintiff would also be moderately limited in her ability to respond appropriately to changes in the work setting, and travel to unfamiliar places. (*Id.*)  The ALJ gave "no weight" to the opinion of plaintiff's licenced Social Worker/Counselor, Jill Van Pelt because it was "not consistent with or supported by the entirety of the evidence, ***particularly in light of possible malingering on the part of the claimant as detailed above.***" (T. 31) (emphasis added).

While the ALJ is entitled to weigh the evidence, in this case, the ALJ misinterpreted Dr. Hare's report, and then cited the misinterpretation twice in her decision.  Dr. Hare did note that on the SIMS, an "actuarial based and empirically developed scale to screen for malingering and symptom over-reporting," plaintiff's score was "elevated, suggesting that her endorsement of psychiatric and cognitive symptoms is inconsistent with symptoms described by individuals who have genuine disorder." (T. 416).  In determining that Dr. Hare's ultimate conclusions were "somewhat invalidated," the ALJ relied only upon this one statement in an entire paragraph of Dr. Hare's report that discussed the issue of malingering or over-reporting. (T. 416).

The ALJ left out the most important part of the cited paragraph. Immediately after the sentence used by the ALJ in finding the possibility of "malingering," Dr. Hare stated that "[g]iven ***the lack of other data that suggests the presentation of feigned symptoms (valid MMPI-2, consistent symptom report on MSE and history), no further evaluation of malingering symptoms appears warranted at this time.***" (*Id.*) (emphasis added). In addition, Dr. Hare stated that, given the "patient's overall level of psychological problems and disorganization, abnormal elevation on this instrument is to be expected." (*Id.*) The ALJ clearly selected only part of a report and substituted her own judgment for that of Dr. Hare. However, the ALJ cannot "'pick and choose' evidence in the record that supports [her] conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

The Appeals Council compounded the error on appeal from the ALJ's decision. In support of plaintiff's appeal, Dr. Hare submitted a two-page letter which attempted to explain his findings and why he believed that the ALJ misinterpreted the report. (T. 1-9, 424-25). The Appeals Council "denied review," but issued a written explanation. (T. 1-9). When the Appeals Council denies review after considering new evidence, the court reviews the entire administrative record to determine whether there is substantial evidence to support the Commissioner's decision. *Rodriguez v. Colvin*, No. 6:13-CV-915, 2016 WL 1337345, at *7 (N.D.N.Y. Apr. 5, 2016) (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). Therefore, the court will review the Appeals Council's decision for substantial evidence.

In his letter to the Appeals Council, Dr. Hare specifically stated that the ALJ "focuses only on one portion of the report, specifically the patient's score on the SIMS inventory." (T. 424). Dr. Hare explained that while the plaintiff's score on the SIMS inventory would "possibly indicate symptom over-reporting, . . . this is only screening inventory that I utilize with other data sources to make an overall determination of the possibility that a patient may be over-reporting symptoms. Thus *use of this score alone to make this determination would be clinically inappropriate.*" (*Id.*) (emphasis added).

Dr. Hare also states that it is important to consider all the data "in a combined nature," and thus, he reviewed the data provided by the other tests that he administered to plaintiff, at least one of which also contained "validity scales." Upon such review, he determined that "other portions of [his] examination of [plaintiff] did not support a conclusion that she was over-reporting symptoms or making any effort to malinger." (T. 424-25). Dr. Hare then specified which of the other tests he administered would have signaled such over-reporting and why. (T. 425). He concluded that "[n]one of these factors were apparent in my examination of [plaintiff]. *Thus, I believe that the judge was incorrect in [her] focus on only one portion of my report.*" (*Id.*) (emphasis added).

Dr. Hare also addressed the ALJ's second basis for giving his report "limited weight." (T. 425). As stated above, ALJ Greener gave limited weight to Dr. Hare's report because of Dr. Hare's observation that plaintiff had "limitations throughout her life," which according to the ALJ, "is inconsistent with her history of performing substantial gainful activity and caring for her children." (T. 31). Once again, the ALJ has substituted her own judgment for that of the medical professional. In his letter to

15

the Appeals Council, Dr. Hare states that he could

> appreciate the judge's confusion on this point, however in my experience it is not uncommon for an individual to have a history of some level of psychological symptoms, but these symptoms do not become disabling until a specific point in their [sic] life.  I believe this to be the case with [plaintiff].

(*Id.*)

Notwithstanding Dr. Hare's explanation, the Appeals Council determined that the ALJ did not misinterpret or mischaracterize Dr. Hare's report, because she cited the sentence of the report correctly. (T. 2).  However, the fact that the ALJ did not mis-cite the report, does not mean that she did not misinterpret the report by leaving out the most important part of the paragraph from which she cited.

The Appeals Council then states that Dr. Hare's supplemental letter "attempts to rationalize away" the fact that plaintiff's score on one of the tests showed evidence of malingering. (T. 3).  However, Dr. Hare's original report specifically stated that plaintiff's scores on the other tests convinced him that malingering was not an issue. He was not trying to "rationalize away," his statement, he was attempting to explain the original statement which he believe that the ALJ misunderstood.

The Appeals Council also attempted to save the ALJ's opinion by stating that Dr. Hare reviewed Dr. Dubro's report and "knew that [Dr. Dubro] had concluded that your only diagnoses were depressive disorder, NOS and anxiety disorder, NOS but based largely on your self-reported symptoms, Dr. Hare included diagnoses of episodic anger problems, rule out schizoaffective disorder, and rule out paranoid schizophrenia." (T. 2).  It appears that the Appeals Council was faulting Dr. Hare for disagreeing with Dr.

16

Dubro's diagnoses or for adding other diagnoses that Dr. Dubro did not make. However, the court notes that Dr. Hare administered more psychological tests than Dr. Dubro. They are both psychologists; thus, their diagnoses would presumably stand on an equal footing. Dr. Hare's determination after reviewing more evidence and administering more tests cannot be discounted simply because he concluded that plaintiff had additional or different diagnoses than found by Dr. Dubro.[6]

In any event, the court notes that Dr. Altmansberger, to whom the ALJ gave "significant weight" also mentioned "R/O schizophrenia, schizoaffective disorder," citing the Broome County Mental Health Report, dated March 23, 2012 which lists these possible diagnoses.[7] (T. 262). In addition, Dr. Altmansberger reviewed Dr. Dubro's report and concluded that plaintiff had more significant limitations than found by Dr. Dubro.[8]

The Appeals Council added a gratuitous reason (not mentioned by the ALJ) for

---

[6] The transcript also contains a June 4, 2012 "Psychiatric Evaluation" written by Kathryn Moulton, Nurse Practitioner in Psychiatry at Broome County Community Mental Health Services. (T. 340-42). Neither Dr. Dubro, nor Dr. Altmansberger would have seen this report because it was written after both doctors' evaluations. However, Dr. Hare did review this document. (T. 413).

[7] The court would point out that Dr. Altmansberger is citing to Ms. Van Pelt's mental health assessment, dated March 23, 2012. (T. 345-46). On June 4, 2012, plaintiff was evaluated at Broome County Mental Health Services by Kathryn Moulton, Nurse Practitioner in Psychiatry, who also noted the "Rule out of Schizophrenia" and "Schizoaffective Disorder." (T. 342).

[8] Dr. Almansberger appears to have reviewed a limited number of documents. He lists only the Binghamton General Hospital Report dated March 23, 2012, the Broome County Mental Health evaluation dated March 23, 2012, and Dr. Dubro's May 24, 2012 report. (T. 262). Because Dr. Altmansberger reviewed fewer reports than are in this record, he assessed the "earliest documented onset of [the] current episode" as March 23, 2012. However, on June 29, 2009, when she lived in Pennsylvania, plaintiff visited the emergency room, complaining of anxiety, anger problems, and auditory hallucinations. (T. 293-310). Dr. Hare listed this emergency room report as one of the documents that he reviewed. (T. 413). He also reviewed all of plaintiff's other medical records. (*Id.*)

17

discounting Dr. Hare's original opinion. The Appeals Council stated that "[a]dditionally, although Dr. Hare is a 'mental health professional; and not a medical doctor, he also included Axis III diagnoses of possible thyroid dysfunction and possible fibromyalgia, but he did not identify the source or basis for his speculation regarding these medical diagnoses." (T. 2). In a footnote, the Appeals Council referred to the May 24, 2012 consultative physical examination by Justine Magurno, M.D. and stated that the examination documented a benign physical examination, except for plaintiff's need to avoid heights, ladders, and dangerous machinery. (T. 2 n.1) (citing T. 217-20).

Contrary to the Appeals Council's statement, Dr. Hare was not "speculating" or diagnosing outside of his specialty. Under Axis III, Dr. Hare stated "possible" fibromyalgia. Plaintiff's new treating physician specifically noted "fibromyalgia" on his "Problem List" and on a Progress note dated October 3, 2012, prior to Dr. Hare's first report. (T. 395). The plaintiff told Dr. Hare that she "may" have a thyroid problem and was being "evaluated for possible fibromyalgia." (T. 414). Plaintiff's medical records also show that her medical providers were attempting to "rule out" causes for her symptoms. On November 21, 2011, the nurse who completed the report stated that they were "r/o anemia, dm, *thyroid*, electrolyte and metabolic dysfunction . . . ."[9] (T.

---

[9] The court would also point out that Dr. Dubro also added an Axis III "diagnosis" of hypertension to his report. (T. 215). Clearly, he (like Dr. Hare) was relying on plaintiff's medical records showing that she had been diagnosed with hypertension, a medical impairment. He was not "diagnosing" plaintiff with hypertension. The hypertension was clearly stated on plaintiff's other medical reports.

331) (emphasis added). Thus, Dr. Hare was not "speculating"[10] about plaintiff's

diagnoses, and the Appeals Council used another improper basis for discounting Dr.

Hare's opinion.

The Appeals Council also criticized Dr. Hare's determination that plaintiff's

GAF score was no higher than 40. (T. 3). The Appeals Council decision listed the

definition of a GAF score of 31-40 and determined that, based on plaintiff's stated

activities, and Dr. Hare's description of some of plaintiff's activities, "this does not

suggest that throughout the previous year, your GAF had been 40 or lower." (T. 3). Dr.

Hare stated in his report that his examination of the plaintiff included "2 hours of

formal psychological testing and 1 hour of face to face interview . . . ." (T. 412). The

Appeals Council cited a few statements made by plaintiff to Dr. Hare and determined

that his GAF assessment was not correct.[11] The Appeals Council improperly

substituted its judgment for that of Dr. Hare.

Finally, the Appeals Council stated that Dr. Hare's report had "internal

---

[10] On October 10, 2012, plaintiff told Ms. Van Pelt during a counseling session that she went to see her primary care physician, who found plaintiff's "thyroid gland to be swollen. She'll have testing for that." (T. 348).

[11] Dr. Hare also stated that the plaintiff showed slowed motor behavior and slowed speech and tone. (T. 414). Her affect was very blunted and restricted, and her mood was depressed. Her thought content showed excessive worry, and she became emotionally agitated and cried during the interview. "There was evidence of psychosis or delusional thinking in that the patient reported that she believes that others want to hurt her, she hears voices, and believes that she knows what others are thinking about her." Thus, there were clearly other considerations that influenced Dr. Hare's decision and the Appeals Council's citation of a few statements to discredit Dr. Hare's determination was not supported by substantial evidence. The court must also note that the use of GAF scores is no longer favored, and this instrumentality has been eliminated from the current Diagnostic and Statistical Manual. *See Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 536 (S.D.N.Y. 2015) (noting that use of GAF has been eliminated, but given that the GAF scale was in use at the time that plaintiff was assessed, there was no error in the ALJ's reliance on the scores).

inconsistencies, and in the Appeals Council's "independent review of the record," it did not rely solely on plaintiff's performance on the SIMS, but considered that the entire record supported the ALJ's findings. (T. 4). The Appeals Council stated that if Dr. Hare's report was redrafted to remove all references to the SIMS, the record would still support the ALJ's decision because Dr. Hare's report would still have "internal inconsistencies," and was still not supported by the other evidence in the record. (T. 4).

However, the court notes that some of the other evidence in the record consists of reports by Ms. Van Pelt, who the plaintiff saw very frequently for counseling.[12] (T. 203-211, 334-39, 348-64). Although Ms. Van Pelt's RFC evaluation contains severe restrictions, noting "extreme" limitations in many areas,[13] and her *conclusions* may have been rejected properly by the ALJ, the ALJ never mentioned Ms. Van Pelt's counseling notes, indicating that plaintiff was having trouble concentrating, and was dealing with auditory hallucinations,[14] although plaintiff did ultimately report that her hallucinations were reduced by new medications. (T. 352-55). The regulations provide that although a social worker is not an "acceptable medical source" for purposes of

---

[12] The record also contains medical records of plaintiff's primary care appointments. (T. 311-32, repeated at 369-92, and 394-410 (plaintiff's new primary care physician)). Some of these appointments refer to plaintiff's mental health and the medications that she is prescribed for her conditions. It is also true that some of these records refer to her taking time off work to be with her autistic son. (T. 318). It is unclear what work this refers to because there is no other indication that plaintiff was working in March of 2012. She did tell Nurse Practitioner Moulton that she was working at the Salvation Army in "February" of 2012 but was told not to come back. (T. 341). However, the court notes that Nurse Moulton's report also states that plaintiff "is a fairly poor historian." (*Id.*)

[13] (T. 366-68).

[14] On April 2, 2012, April 30, 2012, and June 15, 2012, plaintiff told Ms. Van Pelt that she was "anxious and paranoid," and was "still having audio-visual hallucinations that seem to be exacerbated by stress." (T. 203, 205, 358).

"establishing"[15] an impairment, her opinion may be considered "to show the severity of [the] impairment and how it affects [the plaintiff's] ability to work." 40 C.F.R. § 404.1513(d)(3), 416.913 (d)(3). *See also Saxon v. Colvin*, No. 13-CV-165, 2015 WL 3937206, at *6 (W.D.N.Y. June 26, 2015) (citing inter alia *Cordero v. Astrue*, No. 11 Civ. 5020, 2013 WL 3879727, *3 (S.D.N.Y. July 29, 2013)).

The Appeals Council also focused on the alleged inconsistencies in plaintiff's statements to Dr. Hare. (T. 3 & n.2). The Appeals Council cited plaintiff's statement to Dr. Hale that she "could" drive, but that she testified that she did not drive because of her medications. (*Id.*) The court notes that this is not necessarily an inconsistent statement. There is no question that plaintiff "can" drive, however, she told Ms. Van Pelt on April 16, 2012, that she stopped driving because "she goes the wrong way or is stopped at the stop sign, but doesn't go." (T. 363). Plaintiff testified that she could not drive due to her medication and then stated she used to drive, "but I have an accident and I can't." (T. 43). Although the Appeals Council believed these to be "inconsistencies," the record does not support the importance of the alleged "inconsistencies."

Then the Appeals Council focused on "internal inconsistencies" in Dr. Hare's opinion. The Appeals Council stated that although Dr. Hare wrote that plaintiff had no history of "legal involvement," she reported to him that two months prior to Dr. Hare's

---

[15] An acceptable medical source under the regulations is one who can "provide evidence to establish an impairment." 20 C.F.R. § 404.1513(a), 416.913(a). Examples of such sources are licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a)(1)-(a)(5), 416.913(a)(1)-(a)(5).

examination, she attacked a woman physically with no provocation. (T. 3). The Appeals Council then stated that Dr. Hare should have "reasonably" attempted to reconcile this "inconsistency" and should have questioned plaintiff more closely about her trouble working due to her involvement in arguments and conflicts. (T. 3).

It is unclear how the lack of "legal history" is inconsistent with plaintiff stating that she attacked someone two months earlier. Dr. Hare could have interpreted "legal history" as arrest or conviction records or other formal contacts with the law. Plaintiff could have hit someone, and have had no formal contact with law enforcement. In fact, plaintiff appears to have no formal "legal history" according to the record. In addition, with respect to plaintiff's conflicts at work, the court notes that the record supports plaintiff's inability to maintain employment because the Broome County DSS issued plaintiff an "exemption" from participating in "Temporary Assistance Work Activities" because "according to medical evidence he/she is currently unable to work due to a medical issue."[16] (T. 393). Although not binding on the Commissioner, this information does support plaintiff's allegation that she was let go from her DSS job at the Salvation Army.[17] (T. 44, 52-53). Thus, Dr. Hare's report is not "internally inconsistent" in this respect.

---

[16] The court recognizes that the finding in this exemption is not in any way binding on the Commissioner because the law is clear that findings of other agencies are not determinative of disability for purposes of Social Security. *See Bartko v. Commissioner of Soc. Sec.*, No. 1:13-CV-373, 2014 WL 4973158, at *5 (N.D.N.Y. Sept. 30, 2014) (citing inter alia *Lohnas v. Astrue*, 510 F. App'x 13, 14-15 (2d Cir. 2013) (summary order); 20 C.F.R. § 404.1504).

[17] Plaintiff told Nurse Practitioner Moulton that she last worked at the Salvation Army in February of 2012, but was "told not to come back" because people had a hard time dealing with her and she had a hard time "maintaining work because of her symptoms." (T. 341).

The court also notes that neither Dr. Dubro, nor Dr. Almansberger appear to have reviewed many of plaintiff's records in making their findings. They were not aware of Dr. Hare's report because Dr. Hare's original report was written approximately five months after Dr. Dubro's and Dr. Altmansberger's reports. It also appears that Dr. Altmansberger only saw two reports, both dated in March of 2012, but did not cite any of the plaintiff's progress notes from Ms. Van Pelt, while citing to her mental health analysis. (T. 262). Thus, the Appeals Council's "independent review of the record" is not supported by substantial evidence and does not save the ALJ's error in substituting her lay opinions for those of Dr. Hare.

Based on the above, this court finds that the ALJ improperly weighed the medical evidence in plaintiff's case, and neither the ALJ's opinion, nor the opinion of the Appeals Council are supported by substantial evidence. Because the ALJ improperly weighed the medical evidence, her RFC determination is not supported by substantial evidence, and her step five determination is equally unsupported.[18] Thus, this case

---

[18] The court notes that the ALJ's step five determination may have been unsupported even if she had not erred in evaluating Dr. Hare's opinion. The ALJ found at step four that plaintiff was unable to perform her past relevant work, but then determined that her limitations would have "little or no effect on the occupational base of unskilled work at all exertional levels." (T. 31-32). The ALJ cited Social Security Ruling ("SSR") 85-15, stating that as long as the individual can perform the basic mental demands of competitive, remunerative, unskilled work, the individual may be found not disabled. (T. 32). These "mental demands" include the ability to understand, carry out and remember simple instructions, respond appropriately to supervision, co-workers and usual work situations, and deal with changes in a routine work setting. (*Id.*) Although the ALJ stated that plaintiff had no "significant" limitations in the performance of these basic mental demands of work, even Dr. Dubro found that plaintiff had "moderate difficulties" in her ability to interact with others, and she lost her DSS job because she got confused hanging clothes and could not get along with her co-workers, evidenced by her subsequent exemption from the program. It appears that even under the ALJ's original findings, plaintiff may not have been able to meet the requirements of SSR 85-15. On remand, the ALJ may obtain the services of a vocational expert in order to determine whether any jobs exist for plaintiff to

should be remanded for further proceedings.

## VII.  **NATURE OF REMAND**

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). This court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

While the weight given to Dr. Hare's report by the ALJ and the Appeals Council is not supported by substantial evidence, there are gaps in the record regarding what functions plaintiff may be able to perform, and whether there are any jobs in the national economy available for an individual with the plaintiff's limitations.  The ALJ is not necessarily bound by the RFC evaluations submitted by the medical providers and may call a vocational expert to determine whether there are any jobs that plaintiff could perform.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper evaluation of the medical opinion and other evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Report.

---

perform.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 26, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge